UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - X
DANIELLE RIGANO,                         :
                                                        **ECF CASE**
                        Plaintiff,       :

            - against -                  :   05 Civ. 0016 (WCC)

THE COUNTY OF SULLIVAN, SULLIVAN COUNTY :
SHERIFF'S OFFICE, SHERIFF DANIEL HOGUE,
in his capacity as SHERIFF and           :       **OPINION**
individually, UNDERSHERIFF JOSEPH              **AND ORDER**
DECKER, in his capacity as UNDERSHERIFF :
and individually, LAW ADMINISTRATOR
KENNETH LaPORTE, in his capacity as      :
JAIL ADMINISTRATOR and individually,
DEAN WASHINGTON, JERMAINE DAVIS,         :
KEISHAU DAVIS, MARQUIS FIELDS, and
Corrections Officers JAMES PUGH, ROBERT :
McCAULEY, JOHN HAMILTON, ANDEAS
NEDWETZKY, GREG McDOAL, JAMES BILYOU,    :
THOMAS COMPASSO, SGT. JAMES GINTY,
BRIAN GLEASON and BRAD MAGIE, sued in    :
their individual capacities,
                                         :
                        Defendants.
- - - - - - - - - - - - - - - - - - - - X

**A P P E A R A N C E S :**

                            LAW OFFICES OF MICHAEL H. SUSSMAN
                            **Attorneys for Plaintiff**
                            40 Park Place, P.O. Box 1005
                            Goshen, New York  10924

CHRISTOPHER D. WATKINS, ESQ.

         Of Counsel


                            SAMUEL YASGUR
                            SULLIVAN COUNTY ATTORNEY
                            100 North Street
                            Monticello, New York 12701

SAMUEL YASGUR,
  County Attorney
                                        - and -
         Of Counsel


                            **Copies E-Mailed to Counsel of Record**

**A P P E A R A N C E S :   (continued)**

                                        LAW OFFICE OF MICHAEL FREY
                                        46 River Road
                                        P.O. Box 190
                                        Barryville, New York 12719

MICHAEL FREY, ESQ.

        Of Counsel              **Attorneys for the Defendants**
                                   **The County of Sullivan, Sullivan**
                                   **County Sheriff's Office, Sheriff**
                                   **Daniel Hogue, Undersheriff Joseph**
                                   **Decker, Law Administrator Kenneth**
                                   **LaPorte, Corrections Officers**
                                   **James Pugh, Robert Mccauley, John**
                                   **Hamilton, Andeas Nedwetzky, Greg**
                                   **McDoal, James Bilyou, Thomas**
                                   **Compasso, Sgt. James Ginty, Brian**
                                   **Gleason and Brad Magie**

**Conner, Sr. D.J.:**

Plaintiff, Danielle Rigano, brings this action pursuant to 42 U.S.C. § 1983 against defendants the County of Sullivan (the "County"), the County Sheriff's Office (the "Sheriff's Office"), Sheriff Daniel Hogue ("Hogue"), Undersheriff Joseph Decker ("Decker"), County Jail Administrator Kenneth LaPorte ("LaPorte"),[1] inmates of the County Jail Dean Washington ("Washington"), Jermaine Davis ("J. Davis"), Keishau Davis ("K. Davis") and Marquis Fields ("Fields") (collectively, the "inmate defendants"), and Corrections Officers of the County Jail James Pugh ("Pugh"), Robert McCauley ("McCauley"), John Hamilton ("Hamilton"), Andeas Nedwetzky ("Nedwetzky"), Greg McDoal ("McDoal"), James Bilyou ("Bilyou"), Thomas Compasso ("Compasso"), Sergeant James Ginty ("Ginty"), Brian Gleason ("Gleason") and Brad Magie ("Magie"),[2] for violation of his constitutional rights guaranteed by the Eighth Amendment to the United States Constitution.[3]   Plaintiff also brings a claim for negligence against the County defendants, as well as claims for assault, battery and false imprisonment against the inmate defendants.  Plaintiff alleges that he was harassed and beaten by the inmate defendants over the

---

[1] LaPorte was the Jail Administrator of the County Jail from 1999 to January 28, 2005. (*See* LaPorte Aff. ¶ 1.)  As Jail Administrator, he was responsible for the overall functioning of the County Jail, including implementing all procedures and practices for the security and safety of the inmates.  (*See id.* ¶ 2.)

[2] The County, the Sheriff's Office, Hogue, Decker, LaPorte, Pugh, McCauley, Hamilton, Nedwetzky, McDoal, Bilyou, Compasso, Ginty, Gleason and Magie are hereinafter referred to collectively as the "County defendants."

[3] In his First Amended Complaint, plaintiff baldly alleges that the County defendants violated his rights guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. (*See* Am. Complt. ¶ 38.)   However, plaintiff has neither alleged membership in a protected class, denial of a fundamental right nor disparate treatment of any kind.  Accordingly, any Equal Protection claim asserted by plaintiff is dismissed pursuant to FED. R. CIV. P. 12(b)(6).

1

course of a twelve-hour period while serving his sentence at the County Jail, and that the County

defendants failed to properly supervise the inmates or were otherwise deliberately indifferent to the

treatment that plaintiff endured.  The County defendants moved for summary judgment pursuant to

FED. R. CIV. P. 56 on plaintiff's claims brought under 42 U.S.C. § 1983 and for common law

negligence.  Plaintiff thereafter withdrew his § 1983 claim against the County and all claims against

the Sheriff's Office, Hogue, Decker, LaPorte, McCauley, Hamilton, Bilyou and Ginty.  (*See* Pl.

Mem. Opp. Mot. Summ. J. at 1.)  Plaintiff continues to assert: (1) a claim pursuant to 42 U.S.C. §

1983 against Pugh, Nedwetsky, McDoal, Compasso, Gleason, Magie and the inmate defendants; (2)

a negligence claim against the County, Pugh, Nedwetsky, McDoal, Compasso, Gleason and Magie;

and (3) common law claims of assault, battery and false imprisonment against the inmate defendants.

(*See id.*)  For the following reasons, the County defendants' motion for summary judgment is

granted.


## BACKGROUND

Viewed in the light most favorable to plaintiff,[4] the record reveals the following relevant

facts. On the night of November 8, 2002, after socializing at a local bar, plaintiff and William Depaw

("Depaw"), apparently a friend of plaintiff, broke into the home of the individual who owned the bar

---

[4] *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 456 (2d Cir. 2007) ("'In assessing the record to determine whether there is [a genuine issue of material fact], the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'") (quoting *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)); *Tocker v. Philip Morris Cos.*, 470 F.3d 481, 486 (2d Cir. 2006) ("We [must] . . . constru[e] the facts in the light most favorable to the non-moving party . . . ."); *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, No. 03 Civ. 1895, 2007 WL 39301, at *5 (S.D.N.Y. Jan. 8, 2007) ("In determining whether a genuine issue of material fact exists, the Court must examine all evidence in the light most favorable to the nonmoving party.").

that they were frequenting and stole several bottles of liquor and a watch.  (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 30-32).)  A week later, plaintiff was arrested and later pled guilty to second degree burglary and petit larceny.  (*See id.* (Pl. Dep. at 33); Watkins Aff'm, Ex. 1.)  Plaintiff was seventeen years old[5] when he committed the crime and was adjudicated as a Youthful Offender.[6] (*See* Watkins Aff'm, Ex. 1.)  On December 17, 2003, he was sentenced to two hundred hours of community service, five years of probation and incarceration for six consecutive weekends at the County Jail (the "Jail") to commence on January 2, 2004.  (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 36); Watkins Aff'm, Ex. 1.)

On January 2, 2004, at approximately 6:00 p.m., plaintiff's grandfather brought him to the Jail to begin his sentence.  (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 38); Watkins Aff'm, Ex. 1.)  Upon his arrival, he was booked, searched and issued a blue jumpsuit to wear.  (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 42).)  Plaintiff also underwent an intake process required by New York State law  to determine where and in what manner he would be housed.  (*See id.* (Pl. Dep. at 42); LaPorte Aff. ¶ 5, Exs. A, B, D.)

As part of the intake process, all inmates are asked a series of questions by a corrections officer who then completes the "Initial Inmate Classification Form," which results in a score that is used in determining how the inmate will be classified and, as a result, where he will be housed.[7]  (*See* LaPorte Aff. ¶ 6, Ex. A.)  The questions relate to the prisoner's criminal history, present charges,

---

[5] Plaintiff's birth date is September 7, 1985.  (*See* Watkins Aff'm, Ex. 1.)

[6] It appears that plaintiff was adjudicated as a Youthful Offender only on the charge of second degree burglary.  (*See* Watkins Aff'm, Ex. 1.)

[7] Corrections officials possessing specialized training on inmate classification ultimately determine where to house an inmate.  (*See* LaPorte Aff. ¶ 6.)

escape history, age, employment status, residency and other considerations, including, *inter alia*, whether he had: (1) ever been victimized in prison; (2) any enemies currently in the Jail population; (3) cooperated with or provided testimony to law enforcement; (4) a history of mental illness; and (5) any physical disabilities.  (*See* LaPorte Aff., Exs. A, B; County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 42-47).)  In addition, prisoners are asked whether they know of any reason why they should not be placed in general population.  (*See* LaPorte Aff., Ex. B.)  Throughout the entire examination, plaintiff did not indicate anything to suggest that he should not be placed into general population and, based upon his offense and age at the time, he was assigned to maximum security housing reserved for inmates between the ages of sixteen and eighteen, which was located in the Jail's "Cell Block C, Second Tier."[8]  (*See* LaPorte Aff. ¶¶ 5, 7, 11, Exs. A, B; County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 39, 46-47, 49-50).)

After plaintiff's intake was completed, a corrections officer escorted plaintiff through a hallway towards Cell Block C and past the "first tier" where the adult inmates were housed.  (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 49-50, 64, 70).)  When they arrived at the second tier, the corrections officer instructed plaintiff to enter a gated common area containing some tables and chairs and a television.  (*See id.* (Pl. Dep. at 49-50, 55, 59).)  Four or five other inmates were already fraternizing in the area.  (*See id.*)  He was instructed to go into his cell, which was the first cell of five consecutive cells located against the far wall of the common area.  (*See id.* (Pl. Dep. at 49, 51).)  Once plaintiff entered the cell, the corrections officer closed its barred gate by using a lever

---

[8] Although plaintiff's intake score of "3" normally called for a minimum security classification, it was the County's policy to automatically classify inmates as "maximum" if they were serving a sentence for a "C Felony" or above.   (*See* LaPorte Aff. ¶ 7, Ex. A.)  A classification of maximum required the inmate to be confined to a cell as opposed to an open dormitory where inmates with lesser classifications were housed.  (*See id.* ¶ 17.)

located outside the general area. (*See id.* (Pl. Dep. at 49, 60).) The inmate population of Cell Block C, tier two on the weekend of January 2, 2004 consisted of plaintiff, the inmate defendants and Kevin Matthews ("Matthews").[9] (*See id.* (Pl. Dep. at 55).)

It is the Jail's policy for a corrections officer to be stationed at a desk in Cell Block C between the two tiers where he is able to view the barred gates leading into both areas containing the cells. (*See* LaPorte Aff. ¶ 18.) Every fifteen minutes, the corrections officer is required to conduct a visual inspection of the inmates and the tier itself. (*See id.* ¶ 19.) As LaPorte explaind, "[t]o accomplish this, the officer would walk from his desk several feet to the barred door to each grouping of cells and visualize each prisoner and the activities of those prisoners." (*Id.*) In order to insure that the required inspections are conducted, the Jail instituted an electronic recording system know as "Guard1." (*See id.* ¶ 20.) Guard1 monitors the guard's activities by requiring that "[e]ach officer carr[y] a small electronic wand that he must touch to an electronic sensor at the various vantage points at which he . . . position[ed] himself in order to view the inmates." (*Id.*) Each time the officer touches the electronic sensor with the electronic wand, the Guard1 system generates a computerized record of the contact, which can be later printed out in physical form. (*See id.*) It is also the Jail's policy to conduct head counts every eight hours during which the inmates are required to enter their cell so that the guards can "visualize the flesh of each inmate so as to prevent

---

[9] Washington was seventeen years old and convicted of criminal possession of a controlled substance in the fourth degree, J. Davis was either eighteen or nineteen years old and was convicted of criminal possession of a controlled substance in the seventh degree, K. Davis was seventeen years old and was convicted of gang assault in the second degree, Fields was eighteen years old and convicted for criminal possession of a controlled substance in the third degree and Matthews was eighteen years old and convicted of first degree assault. (*See* County Defs. Rule 56.1 Stmt. (received 1/4/07), Ex. B.) All the inmates were African American, except for plaintiff who was a Caucasian. (*See id.*)

the use of dummies in escape attempts." (*See id.* ¶ 21.)

A few minutes after plaintiff was put in his cell, one of the inmate defendants came over to plaintiff's cell and asked him his name and what he was in for. (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 53-54).) Throughout the evening, the other inmate defendants came over and started conversations with plaintiff. (*See id.* (Pl. Dep. at 55).) Plaintiff claims that he did not feel threatened in anyway at this time. (*See id.* (Pl. Dep. at 54).) However, upon learning that plaintiff was sentenced to incarceration only during the weekends, the other inmates threatened him with physical violence if he did not smuggle drugs or alcohol into the Jail the following weekend. (*See id.* (Pl. Dep. at 57, 61-62).)

At some point on Friday evening, a corrections officer instructed plaintiff to switch cells with Matthews, who was in the adjacent cell. (*See id.* (Pl. Dep. at 57-58).) Matthews had to be locked down because he was placed on suicide watch and the lock on the barred gate to the second cell was not functioning. (*See id.* (Pl. Dep. at 60, 79); County Defs. Rule 56.1 Stmt. (received 1/4/07), Ex. B).) At this time, plaintiff did not inform the corrections officer that the other inmates had threatened him because, according to plaintiff, he did not "feel the need to" and their threat did not "bother" him. (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 62-63).)

After plaintiff was moved to the second cell, his cell gate remained open and the other inmates walked "freely" in and out of his cell, casually speaking with him. (*See id.* (Pl. Dep. at 61, 63).) On Saturday morning, the inmates invited plaintiff to watch television with them in the common area of the tier. (*See id.* (Pl. Dep. at 61); Watkins Aff'm, Ex. 6 (Pl. Dep. at 44).) They told plaintiff that they disliked DePaw, plaintiff's codefendant, and that they were going to "hurt him" the next time that they saw him. (*See* Watkins Aff'm, Ex. 6 (Pl. Dep. at 46-47).) It is unclear how

the other inmates knew of DePaw.

The inmate defendants began to "horse around" with plaintiff and he began to feel threatened. (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 63-64); Watkins Aff'm, Ex. 6 (Pl. Dep. at 45, 47).) Plaintiff testified that the inmate defendants were ordering him around, slapping him on the back, punching him with closed fists in the arms, back, chest and stomach, and pushing him around. (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 65-66); Watkins Aff'm, Ex. 6 (Pl. Dep. at 50).) Plaintiff also claims that the inmate defendants uttered racial slurs at him, calling him "whitey" and "cracker." (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 66-67);Watkins Aff'm, Ex. 6 (Pl. Dep. at 51).) Plaintiff protested, but they continued harassing him until lunch was served. (*See* Watkins Aff'm, Ex. 6 (Pl. Dep. at 51-52); County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 67).) Plaintiff does not recall seeing any corrections officers conducting their visual inspections of the inmates and the tier at any time during the morning. (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 65, 67);Watkins Aff'm, Ex. 6 (Pl. Dep. at 53).) However, according to the Guard1 system, a corrections officer conducted an inspection approximately once every twenty minutes on that day. (*See* LaPorte Aff., Ex. E.)

After lunch, plaintiff claims that the harassment worsened. (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 69);Watkins Aff'm, Ex. 6 (Pl. Dep. at 53).) For the remainder of the night, the inmate defendants continued to berate him and push him around and, at one point, they made him dress like a girl and dance on a table. (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 69);Watkins Aff'm, Ex. 6 (Pl. Dep. at 53, 59).) While plaintiff was dancing, the other inmates slapped him in the buttocks and spat on him. (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 73); Watkins Aff'm, Ex. 6 (Pl. Dep. at 59-60, 62).) The inmate defendants also forced plaintiff

7

to do their laundry and smoke a cigarette which they claimed contained banana peel.[10]  (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 73-74); Watkins Aff'm, Ex. 6 (Pl. Dep. at 60-61).)

Between lunch and dinner while the harassment was taking place, plaintiff observed several corrections officers at the gate inspecting the inmates and the tier, but the other inmates engaged in tactics to distract the officers' attention from plaintiff, including screaming at the officers, forcing plaintiff into his cell and standing in front of plaintiff's cell to block the officers' view of him.  (*See* Watkins Aff'm, Ex. 6 (Pl. Dep. at 54); County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 70-72).) According to plaintiff, the inmates also threatened plaintiff that they would kill him if he reported their behavior to the corrections officers.  (*See* Watkins Aff'm, Ex. 6 (Pl. Dep. at 54).)  The officers always remained on the outside of the tier looking in through the barred gate.  (*See id.* (Pl. Dep. at 55, 56-57).)  Plaintiff was able to see the officers touch their wand to the electronic sensor to activate the Guard1 system.  (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 70, 76).)  At this time, plaintiff was not bleeding but had bruises on his chest and arms.  (*See* Watkins Aff'm, Ex. 6 (Pl. Dep. at 57).)

When dinner was served, the inmate defendants stole plaintiff's food and continued to harass him.  (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 75); Watkins Aff'm, Ex. 6 (Pl. Dep. at 58).)  Plaintiff claims that they continued to hit him and push him around.  (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 75); Watkins Aff'm, Ex. 6 (Pl. Dep. at 58).)  They also forced plaintiff to harass Matthews who was still under lock down because he was on suicide watch.  (*See* Watkins Aff'm, Ex. 6 (Pl. Dep. at 61).)  At one point, the inmates held plaintiff against Matthews's cell so

---

[10] The smoking of banana peels is predicated upon the myth that banana peels contain a psychoactive substance called "bananadine" that, if smoked, can cause psychoactive and physiological effects similar to those caused by smoking marijuana.

Matthews could repeatedly hit plaintiff.  (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 77-78).)  Matthews also threw a cup of urine at plaintiff after plaintiff was forced by the other inmates to throw water at him.  (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 78); Watkins Aff'm, Ex. 6 (Pl. Dep. at 61).)  Plaintiff again noticed corrections officers conducting their inspections of the tier, but the other inmates continued to distract the officers and force plaintiff in his cell, threatening him with physical violence if he attempted to get the officers' attention. (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 75, 77).)

At around 11:00 p.m., plaintiff was in his cell and Washington approached him and threatened to beat him up.  (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 79); Watkins Aff'm, Ex. 6 (Pl. Dep. at 63, 79-80).)  According to plaintiff, Washington began to swing his fists at plaintiff, eventually hitting him in the chest.  (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 80);Watkins Aff'm, Ex. 6 (Pl. Dep. at 63).)  Plaintiff then punched Washington in the face, and Washington claimed that he had said "no face," apparently an agreed-upon ground rule unknown to plaintiff.  (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 80); Watkins Aff'm, Ex. 6 (Pl. Dep. at 63, 64).)  Washington then threw plaintiff into the wall of his cell and onto the ground at which point he repeatedly kicked plaintiff in the face, back and stomach.  (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 80); Watkins Aff'm, Ex. 6 (Pl. Dep. at 63-65).)  One of the other inmates yelled that a corrections officer was coming and pulled Washington away from plaintiff.  (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 80-81);Watkins Aff'm, Ex. 6 (Pl. Dep. at 65).)

A corrections officer came to the gate at the entrance of the tier and all the inmates ran to their cells.  (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 81); Watkins Aff'm, Ex. 6 (Pl. Dep. at 66).)  Plaintiff made his way towards the officer, eventually collapsing near the gate, and told

the officer to remove him from the tier.  (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 81);

Watkins Aff'm, Ex. 6 (Pl. Dep. at 66).)  The officer immediately ordered the other inmates to enter

their cells and proceeded to lock the cell gates.  (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep.

at 81).)  He opened the gate to the tier and removed plaintiff.  (*See id.*)

The corrections officer immediately brought plaintiff to the infirmary.  (*See id.* (Pl. Dep. at

81).)  Plaintiff complained of pain in his chest, back and face.  (*See id.* (Pl. Dep. at 82).)  Prison

medical personnel examined his injuries, checked his vital signs, gave him aspirin and asked him

if he wanted to go to the hospital.  (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 82-83);

Watkins Aff'm, Ex. 6 (Pl. Dep. at 68).)   Before being brought to the hospital, the corrections

officers took plaintiff's statement regarding the incident.  (*See* County Defs. Rule 56.1 Stmt., Ex. B

(Pl. Dep. at 83); Watkins Aff'm, Ex. 6 (Pl. Dep. at 68).)  Plaintiff was ultimately brought to the

Emergency Room at Catskill Regional Medical Center where he received further medical attention

and underwent x-ray examinations.  (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 83);

Watkins Aff'm, Exs. 5, 6 (Pl. Dep. 70-71).)

Plaintiff suffered no broken or fractured bones, but had contusions to the ribs, lower jaw and

face, including two swollen black eyes.  (*See* Watkins Aff'm, Exs. 5, 6 (Pl. Dep. at 72, 88).)  Plaintiff

claims that he was unable to sleep lying down for a week after the fight and eventually was treated

by a chiropractor.  (*See id.*, Ex. 6 (Pl. Dep. at 90, 83-84, 96).)   He was also treated by a

gastroenterologist because he was having stomach pains likely caused by the stress stemming from

the  incident.  (*See id.* (Pl. Dep. at 92-93, 94).)  He has had trouble sleeping since the incident and

ultimately anti-depressants were prescribed for him.  (*See id.* (Pl. Dep. at 94-95).)

After he returned to the Jail, the corrections officials questioned plaintiff some more about

10

the incident.  (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 85); Watkins Aff'm, Ex. 3.)

Plaintiff was then relocated to the adult prison system where he was locked down in a cell for the

remainder of the night.  (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 85); Watkins Aff'm,

Ex. 6 (Pl. Dep. at 73-74).)  Plaintiff remained in custody for the remainder of the weekend without

further incident.  (*See* Watkins Aff'm, Ex. 6 (Pl. Dep. at 74).) The inmate defendants were all

subjected to administrative segregation, without commissary or the privilege of receiving outside

packages, for 180 days, except for J. Davis who received the same punishment for thirty days.  (*See*

*id.*, Ex. 3.)

Plaintiff continued to serve his sentence at the Jail each consecutive weekend over the next

five weeks.  (*See id.*, Ex. 6 (Pl. Dep. at 76).)  His family had requested that he be placed on suicide

watch, and he was thereafter housed in a plexiglass-enclosed room where he was watched by a

corrections officer at all times.  (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 88).)  He

experienced no further incidents while serving the remainder of his sentence.  (*See* Watkins Aff'm,

Ex. 6 (Pl. Dep. at 76).)

**DISCUSSION**

**I.**     **Legal Standard**

Under FED. R. CIV. P. 56, a motion for summary judgment may be granted only "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

is entitled to a  judgment as a matter of law."  It is axiomatic that "'at the summary judgment stage

the judge's function is not himself to weigh the evidence and determine the truth of the matter but

to determine whether there is a genuine issue for trial.'" *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).   The Court's role is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994).   In doing so, the Court must resolve all ambiguities and draw all permissible factual inferences against the movant. *See Anderson*, 477 U.S. at 255.   At all times, the burden rests on the movant to demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"'Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor.'" *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 349 (S.D.N.Y. 2006) (quoting *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995)).   The nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Bush v. Fordham Univ.*, 452 F. Supp. 2d 394, 405 (S.D.N.Y. 2006) ("In making its showing that a genuine issue of material fact exists, the nonmoving party may not rely on 'the mere existence of a scintilla of evidence' to support its position, but must instead proffer 'evidence on which the jury could reasonably find for the [plaintiff].'" (quoting *Dawson v. County of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004)).   "However, summary judgment should only be granted '[i]f *after discovery*, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof."'" *Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000) (quoting *Berger v. United States*, 87 F.3d 60, 65 (2d Cir. 1996) (quoting

12

*Celotex Corp.*, 477 U.S. at 323 (emphasis in original; alterations in original).


## II.   Eighth Amendment Claim

Plaintiff alleges that the corrections officers responsible for the supervision of Cell Block C, Second Tier on January 3, 2004 violated plaintiffs' rights guaranteed by the Eighth Amendment by their deliberate indifference to plaintiff's safety.  The law is clear that "'prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners[,]'"[11] and "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."  *Farmer*, 511 U.S. at  828, 833 (alterations in original; quotation marks omitted) (citing *Helling v. McKinney*, 509 U.S. 25 (1993); *Wilson v. Seiter*, 501 U.S. 294 (1991); *Estelle v. Gamble*, 429 U.S. 97 (1976)); *see also Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) ("[T]o state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice."); *Atkins v. County of Orange*, 372 F. Supp. 2d 377, 404 (S.D.N.Y. 2005) (Conner, J.) ("[A] plaintiff must . . . show that the prison officials acted with 'a sufficiently culpable state of mind,' which, in the context of conditions of confinement claims, requires a showing of 'deliberate indifference.'" (quoting *Lunney v. Brureton*, No. 04 Civ. 2438, 2005 WL 121720, at *5 (S.D.N.Y. Jan. 21, 2005) (citing *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996); *Wilson*, 501 U.S. at 298)).

---

[11] As the Supreme Court explained, "[h]aving incarcerated 'persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct,' . . . having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (alterations in original; internal citation omitted).  "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Id.* at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

"Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Hayes*, 84 F.3d at 620; *see also Farmer*, 511 U.S. at 837 ("[A] prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."); *Young v. Coughlin*, No. 93 Civ. 0262, 1998 WL 32518, at *4 (S.D.N.Y. Jan. 29, 1998) (quoting *Farmer*, 511 U.S. at 837); *see also Amaker v. Coombe*, No. 96 Civ. 1622, 2002 WL 523388, at *5 (S.D.N.Y. Mar. 29, 2002) (noting that "[s]ubjectively, the charged official must have a mental state 'equivalent to criminal recklessness'") (quoting *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998) (per curiam) (quoting *Hathaway*, 99 F.3d at 553)).

Plaintiff's Eighth Amendment claim rests on two theories:  (1) the corrections officers employed a practice of placing "new fish" into the "general inmate population of the [J]ail without regard to the safety of" the inmates (*see* Am. Complt. ¶ 23); and (2) the corrections officers did not make proper physical checks of plaintiff during his time in Cell Block C, tier two on January 3, 2004 or, if they did, they must have been aware that plaintiff was being assaulted.  (*See id.* ¶ 26.) Plaintiff's first theory, termed as the "new fish policy," is meritless and apparently draws its origin from the popular prison film, "The Shawshank Redemption."  As a factual matter, the record is devoid of any evidence of the existence of any such policy or practice, and plaintiff denies knowledge of one.[12]  (*See* County Defs. Rule 56.1 Stmt., Ex. B (Pl. Dep. at 92, 96).)  Rather, the

---

[12] In any event, we question how a prison could function if it did not provide for the housing of new prisoners in proximity to seasoned ones.

record clearly shows that the officers followed an established policy by which inmates are asked a series of questions to determine where and in what manner they should be housed.  *See supra* pp. 3-4.  Clearly, the intake and classification process, which plaintiff undeniably underwent, is eminently reasonable.  Moreover, at plaintiff's intake, he failed to indicate any reason why he should not have been housed in general population with other youthful offenders, and the record is devoid of any admissible evidence that the corrections officers knew, or even suspected, that plaintiff would be harassed and assaulted by the other inmates in Cell Block C, tier two.  In fact, plaintiff had been incarcerated in the Jail on a prior occasion and, during the time in question, was serving a sentence for a more serious crime than three of the four inmates who assaulted him.  *See supra* n.9.  *Contra Farmer*, 511 U.S. at 847-48 (prisoner officials realized that plaintiff, a non-violent transsexual who, because of his youth and feminine appearance, was "likely to experience a great deal of sexual pressure in prison.").

Plaintiff's other theory that the corrections officers did not make proper physical checks of plaintiff is equally unavailing.  Despite plaintiff's counsel's arguments to the contrary, the record is clear that corrections officers inspected Cell Block C, tier two with reasonable frequency, (*see* LaPorte Aff. ¶ 20, Ex. E),[13] but nonetheless did not perceive that plaintiff was being harassed or assaulted.  Indeed, plaintiff testified that the other inmates purposefully attempted to distract the officers during their inspections to conceal their abuse of plaintiff, and plaintiff never informed the officers of the situation in fear of physical retaliation from the other inmates.  Moreover, there is no evidence to suggest that the corrections officers would have known that plaintiff was being abused

---

[13] In addition to the visual inspections from outside the tier, the record indicates that the corrections officers conducted two head counts, which entailed locking the inmates in their cells and going to each individual cell to count them.  (*See* LaPorte Aff. ¶¶ 20-21, Exs. E, F.)  *See supra* p. 6.

by simply inspecting the tier from the outside of the barred gate, particularly when the other inmates deliberately attempted to obstruct the officers' view of plaintiff.  Once the corrections officers realized that plaintiff was being assaulted, they immediately removed plaintiff from the tier and provided him with medical attention.  Until that point, the corrections officers had no knowledge that plaintiff faced danger of any kind.  Even assuming, *arguendo*, that the corrections officers were negligent in conducting their inspections, the fact remains that, so far as the record shows, they were given no reason to be aware of his mistreatment or of any danger to him.  *See Hayes*, 84 F.3d at 620 ("[T]o state a cognizable section 1983 claim [for an Eighth Amendment violation], . . . mere negligence will not suffice."); *Rangolan v. County of Nassau*, 217 F.3d 77 (2d Cir. 2000) (dismissing the plaintiff's Eighth Amendment claim where the plaintiff, an inmate, was beaten by his cellmate against whom he had cooperated as a confidential informant, despite the defendants' failure to implement successful procedures to protect the informant); *Ketterman v. City of New York*, No. 00 Civ. 1678, 2001 WL 579757, at *6 (S.D.N.Y. May 30, 2001) (dismissing Eighth Amendment claim when the plaintiff did not allege that "any corrections officer was specifically aware of any substantial risk of harm to him, or aware that another inmate in the general population posed a substantial risk of harm to inmates generally . . . ."); *Magee v. Earl,* No. 91-CIV-8180, 1994 WL 693878, at *4 (S.D.N.Y. Dec. 9, 1994) (dismissing Eighth Amendment claim where prison officials were aware of earlier confrontation between plaintiff and another inmate who ultimately attacked plaintiff with a knife); *Jaipersaud v. A.R.D.C. Bldg. # C-74*, No. 95-CV-5330,1996 WL 1086521, at *3 (E.D.N.Y. June 19, 1996) (no deliberate indifference for failure to post guard in prison mess

16

hall where plaintiff alleged that, had a guard been present, he could have stopped his assault).[14]  By now, it is well-established that to defeat a motion for summary judgment on an Eighth Amendment claim, there must be genuine issues as to whether the corrections officers were aware that the plaintiff faced a substantial risk of serious danger.  *See Farmer*, 511 U.S. at 842-43, n.8; *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006); *Candelaria v. Coughlin*, No. 93 Civ. 3212, 1997 WL 171256, at *10-11 (S.D.N.Y. Apr. 10, 1997).  None exist here.

Plaintiff's experience is, nonetheless, unfortunate.  The hours of tormenting that plaintiff underwent have undoubtedly been harmful to both his physical and mental well-being.  That plaintiff was tormented while he was serving a sentence for second degree burglary makes his plight no less troubling.  However, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety."  *Farmer*, 511 U.S. at 834.  In the present case, it is abundantly clear that the corrections officers were not deliberately indifferent to plaintiff's situation; they simply were unaware of it.  Under these circumstances, although the harm to plaintiff is undeniably the same, his legal recourse is not.  It is oft-quoted that "[t]he Constitution does not guarantee an assault-free prison environment; it promises only reasonable good faith protection." *McGriff v. Coughlin*, 640 F. Supp. 877, 880 (S.D.N.Y. 1986) (Leval, J.).  Here, as soon as the corrections officers realized that plaintiff was being assaulted, they immediately removed him from the tier, provided him with medical attention, punished the culprits and took precautions to ensure that it would not happen again.  The Constitution demands no more.

---

[14] *Contra Morales v. N.Y. State Dep't of Corr.*, 842 F.2d 27, 30 (2d Cir. 1988) (concluding that the district court erred in dismissing the amended complaint as to the defendant corrections officer in light of the plaintiff's claim that the officer stood by and permitted another inmate to attack him).

Accordingly, plaintiff's Eighth Amendment claim must be dismissed.[15]


III.    **State Law Claims**

Plaintiff has also asserted a common law negligence claim against the County and corrections officers Pugh, Nedwetsky, McDoal, Compasso, Gleason and Magie, as well as common law claims of assault, battery and false imprisonment against the inmate defendants.  We decline to exercise supplemental jurisdiction over these state law claims because, as set forth above, none of plaintiff's federal claims are sufficient to survive summary judgment.  *See* 28 U.S.C. § 1367(c)(3); *Johnson v. Washington Mut. Bank, F.A.*, No. 06-2372-cv, 2007 WL 419270, at *2 (2d Cir. Feb. 2, 2007); *Clissuras v. City Univ. of N.Y.*, 90 F. App'x 566, 567-68 (2d Cir. 2004) ("In the absence of any viable federal claims, the district court was well within its discretion in declining to exercise supplemental jurisdiction over plaintiffs' state law causes of action . . . .") (footnote omitted); *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 102-03 (2d Cir. 1998).


**CONCLUSION**

For the reasons stated above, the motion for summary judgment filed by defendants the County of Sullivan, Sullivan County Sheriff's Office, Sheriff Daniel Hogue, Undersheriff Joseph Decker, Law Administrator Kenneth LaPorte, James Pugh, Robert McCauley, John Hamilton,

---

[15] Plaintiff also appears to bring a claim against the inmate defendants pursuant to 42 U.S.C § 1983.  It is well-established that a § 1983 claim is only cognizable against a state actor and not a fellow inmate.  *Bernas v. Cablevision Sys. Corp.*, No. 06-0250-CV, 2007 WL 397395, at *3 (2d Cir. Jan. 30, 2007); *cf. Williams v. Calidonna*, 09:06-CV-0178, 2007 U.S. Dist. LEXIS 7691, at *4-6 (N.D.N.Y. Feb. 2, 2007) (dismissing § 1983 action against inmates who were state informants). Accordingly, all constitutional claims asserted against the inmate defendants are dismissed.

Andeas Nedwetzky, Greg McDoal, James Bilyou, Thomas Compasso, Sergeant James Ginty, Brian

Gleason and Brad Magie is granted.  The Clerk's Office is directed to enter judgment, dismissing

in their entirety Counts Two, Three and Six of the Complaint with prejudice and Counts One, Four

and Five of the Complaint without prejudice, and without costs or attorneys' fees.


SO ORDERED.
Dated: White Plains, NY
        April 13, 2007


                                        _William C. Conner_____
                                        Senior United States District Judge